UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:

KEITH O. MOSES, *aka* KEITH O.D. MOSES,                    Chapter 7
*aka* KEITH MOSES, *aka* DOUGY MO,                         Case No. 10-51769-ess

                                    Debtor.
------------------------------------------------------------------x

FIRST AMERICAN TITLE INSURANCE
COMPANY,

                              Plaintiff,

                                                          Adv. Pro. No. 11-01286-ess

          *-against-*

KEITH O. MOSES, *aka* KEITH O.D. MOSES,
*aka* KEITH MOSES, *aka* DOUGY MO,

                              Defendant.

------------------------------------------------------------------x


**DECISION AFTER TRIAL ON FIRST AMERICAN TITLE INSURANCE COMPANY'S
NONDISCHARGEABILITY CLAIMS PURSUANT TO BANKRUPTCY CODE
SECTIONS 523(a)(2), 523(a)(4), AND 523(a)(6)**

Appearances:

Raymond R. Siberine, Esq.                Keith O. Moses, Esq.
Herold Law, P.A.                         PO Box 8264
25 Independence Boulevard                Jersey City, NJ 07308
Warren, NJ 07059                             *Pro Se*
    *Attorneys for First American Title
    Insurance Company*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

First American Title Insurance Company ("First American") commenced this adversary

proceeding on March 25, 2011 by filing a complaint against attorney and Chapter 7 debtor Keith

Moses.  First American seeks a determination that a judgment debt that it obtained on default in

a New Jersey state court action should not be discharged in Mr. Moses's bankruptcy case under

Bankruptcy Code Section 523(a)(2) because it arose from a false statement or fraud, under

Section 523(a)(4) because it was caused by a fiduciary's defalcation, and under Section

523(a)(6) because it was the result of a willful and malicious injury.  First American's claims

turn on whether Mr. Moses's errors in preparing a Last Will and Testament in 1998, and two

deeds in 2001, were the product of Mr. Moses's negligence or, alternatively, his intentional and

willful misconduct.

## Jurisdiction and Authority To Enter a Final Judgment

First American's nondischargeability claims arise under Bankruptcy Code Sections

523(a)(2), 523(a)(4), and 523(a)(6), and are core matters.  28 U.S.C. § 157(b)(2)(I).  And as core

matters, this Court has constitutional authority to enter a final judgment, because First

American's claims stem "from the bankruptcy itself."  *Stern v. Marshall*, 131 S. Ct. 2594, 2618

(2011).  For these reasons, this Court has jurisdiction to consider and enter judgement on these

claims under 28 U.S.C. § 1334(b) and the Standing Order of Reference dated August 28, 1986,

as amended by Order dated December 5, 2012, of the United States District Court for the Eastern

District of New York.

## Procedural History

<u>The New Jersey State Court Action</u>

Long before this bankruptcy case was commenced, First American brought an action in the Superior Court of New Jersey, Chancery Division (the "New Jersey Action"), in order to quiet title and/or partition real property located at 12 Ivy Place in Jersey City, New Jersey ("12 Ivy Place" or the "Property"). There, First American sought determinations with respect to the nature of the interests in 12 Ivy Place held by three individuals who are now deceased, Lucius Turner, Rose Turner, and Ella Turner, to whom interests were conveyed by deed almost sixty years ago, in 1958 (the "1958 Deed"). The question to be determined in the New Jersey Action was whether those individuals held title to 12 Ivy Place as joint tenants or tenants in common, and the resolution of that issue was necessary to resolve a discrepancy between the deeds to 12 Ivy Place prepared by Mr. Moses in July 2001 (the "July 2001 Deed") and September 2001 (the "September 2001 Deed"), on the one hand, and certain claims to 12 Ivy Place asserted by heirs of Ella Turner, on the other.

Mr. Moses did not appear or participate consistently in the New Jersey Action, and this led to the entry of at least three orders against him. These include a default judgment entered as a sanction on April 12, 2011, an order for final judgment dated August 22, 2011, and an amended order for final judgment dated September 15, 2011 (together, the "New Jersey Judgments"). The New Jersey Judgments include findings of fact to the effect that, among other things, Mr. Moses committed fraud upon the New Jersey court and engaged in a fraudulent conveyance of real property by failing to disclose certain interests in real property in connection with the preparation of probate and related documents, with the consequence that several heirs of

Ella Turner were divested of their interests in the 12 Ivy Place property. The debt created by the September 15, 2011 judgment is $185,295.14 (the "Judgment Debt").

This Bankruptcy Case and Adversary Proceeding

These proceedings have followed a long and circuitous path in this Court, including dispositive motion practice, a failed settlement, the imposition of sanctions, and trial. Mr. Moses filed a Chapter 7 bankruptcy petition on December 17, 2010. Two months later, on February 18, 2011, the Court granted First American's motion for relief from the automatic stay to allow it to proceed with claims against Mr. Moses in the New Jersey Action up to the entry of judgment, with enforcement to be subject to further order of this Court. A month later, on March 25, 2011, First American commenced this adversary proceeding against Mr. Moses by filing a complaint asserting nondischargeability claims under Bankruptcy Code Sections 523(a)(2), 523(a)(4), and 523(a)(6).

Mr. Moses answered the complaint and asserted a "counterclaim" against First American on May 20, 2011. On that same day, the Court held a pre-trial conference at which First American and Mr. Moses appeared. On consent, the Court directed First American to file an amended complaint by June 17, 2011, and Mr. Moses to respond by July 15, 2011. First American responded to the "counterclaim" on May 24, 2011.

First American filed an amended complaint on June 17, 2011, to add a claim based on collateral estoppel. It also requested a pre-motion conference. Two months later, on August 16, 2011, Mr. Moses answered the Amended Complaint, the Court held pre-trial and pre-motion conferences at which First American and Mr. Moses appeared, and the Court set a discovery deadline of October 17, 2011. Later that month, First American made its initial Rule 26

disclosures, and on September 13, September 22, and October 3, 2011, First American advised

the Court that Mr. Moses was in default of his Rule 26 disclosure and other discovery

obligations.

The Court held additional pre-trial conferences on October 11, 2011, and January 3,

2012, at which First American appeared and Mr. Moses did not appear or explain his absence.

At the request of First American, the Court extended the discovery period to November 29,

2011, and then to January 17, 2012, and set deadlines for dispositive motions of March 2, 2012

and then April 2, 2012.

On March 15, 2012, the Court held a pre-trial conference at which First American and

Mr. Moses appeared.  At the next pre-trial conference, on May 17, 2012, First American

appeared and Mr. Moses did not, and the Court extended the deadline for submissions of

dispositive motions, to July 16, 2012.  That date was again extended to September 28, 2012, and

October 22, 2012.

*The Motion for Summary Judgment*

On October 18, 2012, First American filed a motion for summary judgment on each of its

nondischargeability claims.  There, as here, First American challenged the dischargeability of the

judgment debt it obtained on default against Mr. Moses in the New Jersey Action, under three

subsections of Bankruptcy Code Section 523(a).  First American asserted a claim under Section

523(a)(2)(A), that the Judgment Debt arose from Mr. Moses's use of "false pretenses, a false

representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).  First American also asserted a claim

under Section 523(a)(4), that the Judgment Debt arose from Mr. Moses's "fraud or defalcation

while acting in a fiduciary capacity."  11 U.S.C. § 523(a)(4).  And First American asserted a

claim under Section 523(a)(6), that the Judgment Debt arose from "willful and malicious injury" by Mr. Moses "to another entity" or its property. 11 U.S.C. § 523(a)(6).

On November 14, 2012, the Court held a pre-trial conference at which First American and Mr. Moses appeared. One month later, on December 12, 2012, Mr. Moses filed opposition to the Summary Judgment Motion styled as an "Answer." That same day, the Court held a pre-trial conference and hearing on the Summary Judgment Motion, at which First American appeared and Mr. Moses did not appear. Then, on December 20, 2012, the Court held another pre-trial conference and hearing on the Summary Judgment Motion, at which First American and Mr. Moses appeared. Briefing on the Summary Judgment Motion was completed on January 17, 2013, when First American filed a reply brief.

On January 24, 2013, the Court heard argument on the Summary Judgment Motion from First American and Mr. Moses. On April 25, 2013, the Court held a pre-trial conference and further hearing on the Summary Judgment Motion, and reserved decision.

On July 19, 2013, the Court issued a Memorandum Decision and Order denying the Summary Judgment Motion. There, the Court declined to give collateral estoppel effect to the New Jersey default judgment with respect to the issues of Mr. Moses's knowledge and intent based on, among other things, the New Jersey law of collateral estoppel in the context of a default judgment, and denied summary judgment on First American's Section 523(a)(2)(A), 523(a)(4), and 523(a)(6) claims.

Specifically, with respect to whether collateral estoppel effect should be accorded to the New Jersey default judgment, this Court concluded that it should give the same collateral estoppel effect to the judgment as would a New Jersey state court. The Court concluded that

First American had not demonstrated that the facts determined for purposes of the New Jersey default judgment were "actually litigated" in that forum, and that First American had not shown that those matters were determined "on the merits."  And based on the entire record, the Court declined to apply collateral estoppel effect to the New Jersey default judgment with respect to the issue of Mr. Moses's knowledge and intent.

With respect to First American's Section 523(a)(2)(A) claim, the Court concluded that First American had shown that there was no genuine dispute of material fact with respect to the first, fourth, and fifth elements of its claim, that Mr. Moses made false representations, that First American justifiably relied on those representations, and that it sustained a loss that was proximately caused by the false representations.  But the Court also concluded that First American had not established that there was no genuine dispute of material fact as to the second element of its Section 523(a)(2)(A) claim, whether Mr. Moses was aware of the falsity of the representations when they were made, and the third element of that claim, whether Mr. Moses made the false representations with the intent to deceive.

With respect to its Section 523(a)(4) claim, the Court concluded that First American had shown that there was no genuine dispute of material fact as to the first and second elements of the claim, that the Judgment Debt was incurred in connection with an express or technical trust, and that Mr. Moses acted in a fiduciary capacity with respect to that trust.  But the Court also concluded that First American had not established that there was no genuine dispute of material fact as to the third element of its Section 523(a)(4) claim, whether Mr. Moses carried out his professional activities with the required culpable state of mind.

With respect to its Section 523(a)(6) claim, the Court concluded that First American had

not shown that there was no genuine dispute of material fact as to either element of this claim, that Mr. Moses acted willfully to cause injury to First American, or that he acted maliciously and that it was evident to Mr. Moses that his conduct would cause injury to First American.

*The Trial and Efforts To Settle this Adversary Proceeding*

On August 2, 2013, the Court held a pre-trial conference at which First American appeared but Mr. Moses did not.  On August 5, 2013, the Court issued an order directing each of the parties to prepare and file a Pre-Trial Statement.  First American filed its Pre-Trial Statement on September 6, 2013, and Mr. Moses filed his Pre-Trial Statement on September 20, 2013.  On September 20, 2013, the Court also held a pre-trial conference at which both First American and Mr. Moses appeared and were heard.  On October 15, 2013, the Court held an additional pre-trial conference at which First American appeared but, again, Mr. Moses did not.

On October 21, 2013, the Court issued a Scheduling Order setting trial to commence on December 18, 2013.  On December 10, 2013, the Court held a final pre-trial conference at which First American and Mr. Moses appeared.

Trial began on December 18, 2013, and the Court heard testimony from John Turner and Mildred Turner.  On December 19, 2013, the Court heard testimony from Mr. Moses.  Trial continued on January 24, 2014, March 14, 2014, April 15, 2014, April 16, 2014, and July 22, 2014, at which Mr. Moses continued to testify.  On July 22, 2014, First American rested.

*The Prospect of Settlement*

After a recess on July 22, 2014, the parties advised the Court that they had reached an agreement in principle on the outline of the terms of a settlement.  The parties noted on the record that they would document their understanding in a settlement agreement to be approved

by this Court.  For approximately the next four months, from the end of July 2014 until early November 2014, the parties worked toward a consensual resolution of this matter.

But before that happened, Mr. Moses had a change of heart and determined that he wanted to continue with trial.  In response, First American moved on November 13, 2014, to enforce the settlement terms.  On December 2, 2014 and December 3, 2014, the Court held conferences with the parties, and on December 10, 2014, the Court heard argument on the motion to enforce the settlement, and reserved decision.  On December 19, 2014, the Court issued an order denying First American's motion to enforce the settlement and found, among other things, that the parties had not reached a definitive agreement on certain material settlement terms.

*The Conclusion of the Trial and the Sanctions Order To Show Cause*

The trial resumed with Mr. Moses's case on January 23, 2015.  That morning, almost four years after this adversary proceeding was commenced, Mr. Moses filed a "First Amended Counterclaim."  The Court scheduled an additional trial date for February 23, 2015, when First American appeared but Mr. Moses did not.  The Court issued an order to show cause why sanctions should not be imposed against Mr. Moses based on his failure to proceed with trial (the "Sanctions OSC"), and set April 14, 2015, as the continued date for trial and a hearing on the Sanctions OSC.  On that day, Mr. Moses filed a Second Amended Witness List, a response to First American's opposition to the First Amended Counterclaim, and a response to the Sanctions OSC.  The trial continued with First American's cross-examination of Mr. Moses, and the Court scheduled an additional trial date for May 11, 2015.  The Court authorized Mr. Moses to file an application for leave to file an amended counterclaim by April 21, 2015, which he filed timely.

-8-

Also on that day, Mr. Moses filed an application for an order extending the time to file his trial exhibits.

Mr. Moses did not appear for trial on May 11, 2015. The Court held a conference later that day, and granted in part the Sanctions OSC, awarding First American costs in the amount of $1,000, to be paid by June 12, 2015. Trial resumed on July 14, 2015. On August 27, 2015, the Court entered orders denying Mr. Moses leave to file an amended counterclaim, and granting Mr. Moses additional time to produce and file exhibits with respect to the original "counterclaim" filed on August 16, 2011.

Trial continued on August 31, 2015, and September 1, 2015, when the Court closed the record. Post-trial briefs were due by November 16, 2015. First American filed its post-trial brief on November 13, 2015, the Court extended Mr. Moses's deadline until November 19, 2015, and Mr. Moses filed his post-trial brief on November 23, 2015. On December 7, 2015, counsel for First American advised the Court that it had not been served with Mr. Moses's post-trial brief. On December 8, 2015, the Court entered an order directing Mr. Moses to file proof of service of his post-trial brief on counsel for First American by December 9, 2015, at 12:00 noon. The Court heard closing arguments on December 10, 2015, and reserved decision. On January 11, 2016, Mr. Moses filed a certificate of service of his post-trial brief on counsel for First American.

### The Evidentiary Record

The trial of this matter took place over thirteen days, from December 18, 2013, to September 1, 2015, when the Court closed the record. This extended period resulted from a hiatus of some six months, from July 2014 to January 2015, as the parties and the Court

-9-

addressed matters related to a possible settlement, as well as several delays occasioned by Mr. Moses missing deadlines, appearing but being unprepared for trial, or not appearing at all. First American called three witnesses, John Turner, Mildred Turner, and Mr. Moses. First American's witnesses testified over a period of seven trial days, and the testimony of Mr. Moses occurred on six of these days. Mr. Moses called two witnesses, himself and Raymond Siberine, Esq., counsel for First American.

In connection with First American's case, the Turners testified, in substance, about the family members who resided at 12 Ivy Place, how Mr. Moses came to be retained as the attorney to prepare Rose Turner's Last Will and Testament (the "Rose Turner Will"), and the preparation of the July 2001 Deed and September 2001 Deed reflecting the transfer of title to the Property. Mr. Moses testified, in substance, about his training and background, the steps that he takes when preparing a will or a deed for a client, the steps that he took in preparing those documents for the Turners, and the reasons that he was not able to produce some of his client files.

In defense, Mr. Moses testified on his own behalf, and addressed many of the same subjects covered during his examination by First American. Mr. Moses also called Mr. Siberine as a witness, who testified about, among other things, the background of the New Jersey Action and the basis for the nondischargeability claims asserted here.

*First American's Case*

The Testimony of John Turner and Mildred Turner

Siblings John and Mildred Turner testified concerning the history of the 12 Ivy Place property. They lived with their parents Rose and Lucius Turner at 12 Ivy Place, a three-family dwelling, where the family moved in 1958; John Turner was six years old at the time. Several

other relatives also lived at 12 Ivy Place over time, including John and Mildred's grandmother Ella Turner, and their aunt and uncle Odessa and Virgil Turner and their three children.

In 1969, Rose and Lucius Turner and their children moved out of 12 Ivy Place, and several cousins of John and Mildred Turner moved in. John Turner testified in general and credible terms about the ownership of 12 Ivy Place, and indicated that he understood that the property was owned by his parents and his grandmother during his youth. Mr. Turner indicated that to the best of his knowledge, his grandmother Ella Turner did not at any time deed away her interest in 12 Ivy Place.

Ella Turner passed away on May 29, 1990, at the age of 106, and did not have a will. Lucius Turner passed away on June 15, 1990, and also died intestate. At some point in 1998, Rose Turner, who was suffering from cancer, decided she wanted to prepare a will and enlisted her daughter Frances Turner to help her locate an attorney. Frances Turner identified Mr. Moses, and Rose Turner retained him as her attorney to prepare a will. Mr. Moses went to Rose Turner's house and, after speaking with her about her intentions, prepared the Rose Turner Will. Rose Turner signed her Last Will and Testament on April 9, 1998.

Rose Turner passed away on June 3, 1998. Mr. Moses came to Rose Turner's house where the Turner family was gathered after the funeral, and read her will to the family. John Turner testified that he understood that Rose Turner intended to transfer her interest in 12 Ivy Place to Odessa Turner, her sister-in-law. In her will, Rose Turner bequeathed her interest in 12 Ivy Place to Odessa Turner, and the July 2001 Deed reflects that transfer from the estate of Rose Turner to the estate of Odessa Turner. Neither the Rose Turner Will nor the July 2001 Deed acknowledges other interests in the Property or indicates that Odessa Turner acquired anything

other than a fee simple interest in the property.  The Rose Turner Will states:

> I give, devise, and bequeath my real property known as 12 Ivy Place, Jersey City, to my sister-in-law, Odessa Turner, should she survive me by thirty days.  And if [she] shall not so survive, then I leave the property to Frances Turner and Mildred Turner or to the survivor of them should she survive me by thirty days.

Pl's Ex. 31 at 5.

The July 2001 Deed prepared thereafter by Mr. Moses similarly indicates that John Turner, as executor of the will of Rose Turner, transferred the Property to the estate of Odessa Turner.  Neither the Rose Turner Will nor the July 2001 Deed acknowledges an interest other than Rose Turner's in the Property.

The testimony of John Turner and Mildred Turner was straightforward, direct, and credible.

### The Testimony of Mr. Moses

Mr. Moses testified that he graduated from New York Law School in 1989 and was sworn in as a member of the bar of the States of New Jersey and Connecticut in 1990.  Upon graduation, he started his own private practice and also "moonlighted" as an administrative services clerk in Kings County Surrogates Court, where he remained employed until 1997.  Tr. 12/19/13 at 13.  Mr. Moses indicated that he took a real property class in law school but did not specifically remember it.

Mr. Moses described his understanding of the difference between the legal doctrines of joint tenancy and tenancy in common, and acknowledged that he may not have had a clear understanding of the distinction in 1998 when he prepared the Rose Turner Will, or in 2001 when he prepared the July 2001 Deed and the September 2001 Deed.  He testified that he "learned [the distinction between a joint tenancy and a tenancy in common] in the course of the

-12-

years practicing or . . . in school or in [his] experience in the Surrogate's Court or attending various educational seminars." Tr. 12/19/13 at 16. Although he is not certain when he came to understand the distinction, he is "certain of [the distinction] now." Tr. 12/19/13 at 16.

Mr. Moses also described the general steps that he takes when preparing a will for a client. Mr. Moses explained that, when preparing a will, he operates under the "assumption that the testator or testatrix is going to be truthful about ownership [of real property]." Tr. 12/19/13 at 34. Mr. Moses testified about his philosophy of taking his clients at their word:

> A person can say, "I own the Empire State Building." I'll put it down in the will. It is not for me to challenge that person, especially on the deathbed. Because I'm only creating a will. A will does not by itself – even when it's probated – it does not dispose of the property. You have to create a deed.

Tr. 12/19/13 at 36. He also testified that, when preparing wills for gravely ill clients, he is "more concerned about the urgency of getting the will signed" than he is about verifying the accuracy of his clients' claims to real property ownership. Tr. 12/19/13 at 37.

Mr. Moses described his procedure to create deeds for clients. He stated that as distinct from the creation of a will, verification is essential to the creation of a deed. Mr. Moses testified that "it's impossible to make a deed unless you have the old deed," and agreed that one "needs the prior deed to prepare a new deed out." Tr. 12/19/13 at 40.

Mr. Moses explained that before he prepared the July 2001 Deed, he examined the 1958 Deed. And he acknowledged that in preparing that deed showing the transfer of the Property from Rose Turner to Odessa Turner, he "made an error." Tr. 12/19/13 at 50. Specifically, Mr. Moses acknowledged that he misinterpreted the 1958 Deed to mean that Rose and Lucius Turner held title as joint tenants with the right of survivorship, and at Ella Turner's death, Rose and Lucius Turner would retain full ownership of 12 Ivy Place. With the benefit of hindsight, he

described his error as follows:

> Well, this is – that is what I – this is where the error occurred. The fact that [the 1958 Deed] said his wife was incorrectly taken to mean that they had joint tenancy. But according to the law, I believe the joint tenancy is not created where you have another person who has an interest in the property. So that it appears that Ella Turner had a half interest and Rose and [Lucius] Turner had the other half interest, but they would own not as joint tenants. Therefore, when Ella Turner died, her interests remain in her estate."

Tr. 12/19/13 at 52.

When pressed on what caused him to misinterpret the language of the 1958 Deed, and his understanding of joint tenancies as compared to tenancies in common when he prepared the July 2001 Deed, Mr. Moses stated that he "cannot recall now what made me make the error." Tr. 1/24/14 at 24. And Mr. Moses acknowledged that "John Turner had no right to convey the interest of Ella Turner without first obtaining letters of administration of the Estate of Ella Turner." Tr. 1/24/14 at 45. That is, the July 2001 Deed that Mr. Moses created erroneously does not account for the fact that at the time of her death, Rose Turner possessed only a one-half share in 12 Ivy Place.

Mr. Moses described a series of letters sent to him by First American's counsel in 2009 concerning the New Jersey Chancery Court action brought by First American to quiet title to 12 Ivy Place. First American asked Mr. Moses to produce any documents that would show Rose, Lucius, and Ella Turner to be joint tenants, as Mr. Moses's July 2001 Deed described them. Mr. Moses responded to First American's counsel that he had stored some of his client files at an offsite U-Haul storage facility, that documents related to the July 2001 Deed might be located there, and that he would search for them.

Mr. Moses also testified that in 2009, he "had some financial difficulty and could not

-14-

make the monthly [storage facility] payments." Tr. 3/14/14 at 18.  He stated that the U-Haul storage facility eventually "sold the contents of the bin" – the storage unit – and as a result, he was not able to "obtain the files from storage." Tr. 3/14/14 at 19, 22.

Mr. Moses's testimony was direct, persuasive, and credible.  In particular, he acknowledged in candid and credible terms that he made mistakes in interpreting the interests created by the 1958 Deed, and testified credibly that the subsequent events flowed, inevitably but unintentionally, from his errors.

### *Mr. Moses's Case*

#### The Testimony of Mr. Moses

Mr. Moses offered his own testimony in response, over a period of three trial days.  His testimony addressed many of the same subjects that were covered in his testimony elicited during First American's case, and it was consistent with that testimony.  Mr. Moses described the circumstances surrounding his retention by Rose Turner to prepare her will, including the initial contact by her daughter Frances Turner, Rose Turner's desire promptly to execute a will in view of her illness, and the steps that he took to obtain witnesses to the execution of the will.  He also acknowledged and described again the errors that he made in connection with the Rose Turner Will, the July 2001 deed that conveyed the Property from the estate of Rose Turner to the estate of Odessa Turner, and the September 2001 deed that conveyed the Property from the estate of Odessa Turner to her grandsons Wesley McFadden and Ed Turner.  And he reiterated the circumstances surrounding his use of the U-Haul storage facility for offsite record storage, his financial difficulties in mid-2009, his default in paying the storage fees, and the sale of his storage unit's contents.

Here too, Mr. Moses's testimony was direct, persuasive, and credible, and consistent with his previous testimony.  In particular, he candidly and credibly acknowledged that he made mistakes in interpreting the interests created by the 1958 Deed, and testified credibly that the subsequent events were caused by this misunderstanding.  And he again confirmed credibly the circumstances surrounding the loss of his files.

The Testimony of Mr. Siberine

Mr. Moses also called Mr. Siberine as a witness, and he testified over the course of two days.  Mr. Siberine testified that his former firm was retained by First American to investigate and address a claim that had been made with respect to a title insurance policy issued by First American.  He testified that as a result of his investigation, First American filed a complaint against Mr. Moses and other defendants to quiet title with respect to 12 Ivy Place in the New Jersey Action, and that two of those claims sought sanctions against Mr. Moses and others for fraud on the court.  Mr. Siberine testified that when he filed the New Jersey Action, he had a good faith basis to believe that the fraud allegations were well-grounded, and that part of the basis for those allegations was that the Rose Turner Will referred to 12 Ivy Place as Rose Turner's exclusive property, when she had only a one-half interest.  And Mr. Siberine also testified about certain disciplinary proceedings that First American brought against Mr. Moses in New Jersey, and the default judgments that were entered against him in the New Jersey Action.

Mr. Siberine's testimony was credible and consistent with First American's allegations concerning Mr. Moses's failures adequately to respond to its requests for documents and information supporting the real property interests reflected in the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed.  His testimony also supported First American's

assertions as to Mr. Moses's failures adequately to respond in the New Jersey Action, and the reasons for First American's concerns about Mr. Moses's client files.

### Discussion

It has long been recognized that the fundamental purpose of the Bankruptcy Code is to provide a "fresh start" to the "honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (noting the fresh start policy underlying the Bankruptcy Code). For an individual Chapter 7 debtor, this "fresh start" is accomplished by allowing the debtor a discharge from most debts that arose before the filing of the bankruptcy petition, in exchange for liquidation of the debtor's non-exempt assets for the benefit of the debtor's creditors. But a fresh start has its limits, and some debts may be excepted from discharge if a creditor demonstrates that the debts are the product of a fraud, a fiduciary defalcation, or other willful and culpable behavior.

In Section 523, Congress has identified certain categories of non-dischargeable debts. These exceptions apply where the debts at issue implicate significant public policy, equitable, or fairness considerations, including where money, property, or services is obtained under false pretenses, where a debtor knowingly omits an obligation from his schedules, and where a debt arises from some fault of the debtor. Exceptions also apply with respect to certain special kinds of obligations, such as taxes, educational loans, and spousal and child support. *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1756, 1761 (2013).

A finding of nondischargeability as to a particular debt requires a substantial showing by a creditor, because from a debtor's perspective, a nondischargeability determination undermines

the opportunity for a fresh start. At the same time, a nondischargeability finding should not be impossible to achieve, because from a creditor's perspective, it holds a wrongdoer accountable for the economic consequences of his or her misconduct. And from a court's perspective, the questions raised by a challenge to dischargeability may go to the integrity of the bankruptcy system.

As the Supreme Court has observed, exceptions to discharge "should be confined to those plainly expressed," in accordance with the bankruptcy law purpose of the fresh start. *Bullock*, 133 S. Ct. at 1760. And as this Court has noted, "this penalty is not lightly to be invoked, as it is widely recognized that exceptions to discharge are narrowly construed." *Chao v. Duncan (In re Duncan)*, 331 B.R. 70, 87 (Bankr. E.D.N.Y. 2005).

Here, First American relies on three subsections of Section 523(a) to argue that the Judgment Debt should not be discharged. First American argues that the Judgment Debt arises from Mr. Moses's use of "false pretenses, a false representation, or actual fraud," and should be found nondischargeable under Section 523(a)(2)(A). 11 U.S.C. § 523(a)(2)(A). First American also argues that the Judgment Debt arises from Mr. Moses's "fraud or defalcation while acting in a fiduciary capacity," and similarly should be found nondischargeable under Section 523(a)(4). 11 U.S.C. § 523(a)(4). Likewise, First American argues that the Judgment Debt arises from "willful and malicious injury" by Mr. Moses to "another entity or the property of another entity," and should be found nondischargeable under Section 523(a)(6). 11 U.S.C. § 523(a)(6). The Court will consider each of these claims in turn.

*Whether First American Has Established that the Judgment Debt Is Nondischargeable Under Bankruptcy Code Section 523(a)(2)(A)*

Bankruptcy Code Section 523(a)(2)(A) excepts from discharge "any debt for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement in writing respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To prevail on a Section 523(a)(2)(A) claim, a creditor must establish five elements: first, that the debtor made a false representation; second, that the debtor knew the representation was false at the time it was made; third, that the debtor made the false representation with the intent to deceive the creditor; fourth, that the creditor justifiably relied on the representation; and finally, that the creditor sustained a loss that was proximately caused by the false representation. *Fleet Credit Card Servs. L.P. v. Macias (In re Macias)*, 324 B.R. 181, 187 (Bankr. E.D.N.Y. 2004) (citation omitted). Bankruptcy Rule 4005 provides that "at the trial of a complaint objecting to discharge, the plaintiff has the burden of proving the objection." A creditor arguing for nondischargeability under Section 523(a) must establish each of the elements of its claim by a preponderance of the evidence. *Grogan*, 498 U.S. at 285.

Whether Mr. Moses Made False Representations

The first element that First American must establish is whether the debtor made a false representation. *In re Macias*, 324 B.R. at 187. First American asserts, and Mr. Moses does not dispute, that Mr. Moses made a number of false representations, because the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed that he prepared do not disclose that Rose Turner held only a one-half interest in 12 Ivy Place.

In its Memorandum Decision on Plaintiff's Motion for Summary Judgment, the Court found that First American established this element. *First Am. Title Ins. Co. v. Moses (In re Moses)*, 2013 Bankr. LEXIS 2917, at *27 (Bankr. E.D.N.Y. July 19, 2013). There, the Court

-19-

found:

> It is undisputed by the parties that Mr. Moses made a false representation. The documents that he prepared did not disclose the interests in the Property that were held by other parties. As a result, First American has shown that there is no genuine dispute of material fact as to this element of its Section 523(a)(2)(A) claim.

*In re Moses*, 2013 Bankr. LEXIS 2917, at *27.

Because the Court found at summary judgment that First American established this element, this finding is law of the case, and First American has established the first element of its Section 523(a)(2)(A) claim, that Mr. Moses made a false representation.

<u>Whether Mr. Moses Knew that the Representations Were False when they Were Made</u>

The second element that First American must establish is whether, at the time Mr. Moses made the representations, he knew that they were false. *In re Macias*, 324 B.R. at 188. This element turns on the debtor's "actual state of mind . . . at the time" the misrepresentation was made. *In re Parkhurst*, 202 B.R. 816, 822 (Bankr. N.D.N.Y. 1996). And this element is satisfied if the maker of the representation knew or believed that the matter was not as represented, did not have confidence in the accuracy of his or her representations, or knew that he or she did not have a basis to make the representations. *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 407 (5th Cir. 2001). As set forth in the *Restatement (Second) of Torts*:

> A misrepresentation is fraudulent if the maker
>
> (a)    knows or believes that the matter is not as he represents it to be,
>
> (b)    does not have the confidence in the accuracy of his representation that he states or implies, or
>
> (c)    knows that he does not have the basis for his representation that he states

-20-

or implies.

*Restatement (Second) of Torts* § 526 (1977).

First American argues, in substance, that Mr. Moses *knew* that his clients John Turner and Louella McFadden had only a partial interest in 12 Ivy Place but represented otherwise in the documents he prepared in connection with the Property, including the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed.  As evidence, First American points to the original 1958 Deed, which does not identify the grantees as joint tenants with the right of survivorship.

First American also argues that Mr. Moses did not mistakenly create the July 2001 Deed and the September 2001 Deed, which misstate the interests of the Turner family members, but rather, that he created them in furtherance of a fraud on First American and, to the extent that the Rose Turner Will and the July 2001 Deed were submitted to probate, a fraud on the New Jersey courts.  First American states that Mr. Moses prepared documents indicating that the interests of Lucius, Rose, and Ella Turner were those of joint tenants, which cut off Ella Turner's heirs, rather than tenants in common, in order to avoid the costs and burdens of identifying and obtaining the consent of those prospective additional heirs to the conveyance.  First American also suggests that Mr. Moses's interpretation of the 1958 Deed is so plainly wrong that it could only have resulted from intentional misconduct or fraud.  As evidence, First American points here, as well, to the 1958 Deed.

Mr. Moses responds, in substance, that he made errors in preparing the July 2001 Deed and September 2001 Deed, and that his errors were simply negligent but honest mistakes, as opposed to a fraud.

The evidence shows that Mr. Moses acknowledged repeatedly, consistently, in substantial detail, and credibly, that he made an error in construing the 1958 Deed when he prepared the July 2001 Deed and the September 2001 Deed.  In particular, the evidence shows that Mr. Moses created the inaccurate July 2001 Deed after he misconstrued the 1958 Deed as creating a joint tenancy among Lucius Turner and Rose Turner (who were husband and wife), and Lucius's mother Ella Turner.  Mr. Moses testified persuasively and credibly that he did not recall what caused him to make the error when he prepared the Rose Turner Will, the July 2001 Deed, or the September 2001 Deed.  And Mr. Moses testified convincingly and credibly that this misinterpretation was the product of an error, not a fraud.

The evidence also shows that First American has not established that Mr. Moses had a financial incentive, an opportunity for personal gain, or any other reason or motive to draft the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed as he did.  And the evidence, taken as a whole, shows that First American has not established that Mr. Moses's mistakes occurred intentionally or by design rather than as the result of mere negligence or mistake.

For these reasons, and based on the entire record, the Court finds that First American has not established the second element of its Section 523(a)(2)(A) claim, that Mr. Moses knowingly made the false representations at issue in this action.

Whether Mr. Moses Made the Representations with the Intent To Deceive

The third element that First American must establish is whether, at the time that Mr. Moses made the false representations, he did so with the intent to deceive.  *In re Macias*, 324 B.R. at 192.  This element requires First American to show that Mr. Moses's conduct was

"marked by moral turpitude" or that the misconduct was an "intentional wrong." *New York v. Suarez (In re Suarez)*, 367 B.R. 332, 349-350 (Bankr. E.D.N.Y. 2007). And "while recklessness may be a sufficient basis to infer knowledge, it does not, without more, demonstrate a deliberate intention to cheat or mislead." *In re Suarez*, 367 B.R. at 350. For example, one court found that a debtor's act of executing closing documents without reading them was reckless but did not rise "to the level of actual fraud or deceit as required by [Section] 523(a)(2)(A)." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 766 (Bankr. E.D. Tenn. 2003).

Similarly, this Court found in another case that a debtor's misrepresentations as to whether a business was exempt from certain business laws demonstrated "a reckless disregard for whether the representation was false" but that this recklessness, without more, did not demonstrate an intent to deceive or defraud. *In re Suarez*, 367 B.R. at 350. As with the second element of this claim, this element also turns on the debtor's state of mind at the time that the misrepresentation was made.

First American alleges that in preparing the July 2001 Deed, Mr. Moses "fraudulently misrepresented that Lucius, Rose and Ella Turner held title as joint tenants and/or that full title, not a partial interest," was being conveyed. Am. Compl. ¶ 6. And First American states that Mr. Moses "falsely and knowingly misrepresented [the Turners' interests]" in the July 2001 Deed. Am. Compl. ¶ 22.

Mr. Moses responds, in substance, that he made mistakes in preparing the July 2001 Deed, but that those errors were caused by a mistake or negligence, and were not made with the intent to deceive First American.

Here, too, the evidence shows that Mr. Moses's misrepresentations were not made with

-23-

the intent to cheat, deceive, or defraud First American.  As noted above, Mr. Moses testified

persuasively and credibly that the mistakes that he made in preparing the Rose Turner Will, the

July 2001 Deed, and the September 2001 Deed were the result of his "error [in that he] did not

countenance" the nature of Ella Turner's, Rose Turner's, and Lucius Turner's interests, for

reasons that Mr. Moses does not recall.  Tr. 1/23/15 at 26.

      First American has not shown, and the evidence does not indicate, that Mr. Moses

possessed a "reckless" state of mind when he prepared the Rose Turner Will, the July 2001

Deed, or the September 2001 Deed, or that he set out to deceive First American when he

prepared those documents, or that the false statements contained in those documents were the

consequence of deception or other intentional misconduct, rather than mistake.  The record

similarly does not support the conclusion that Mr. Moses had a financial incentive, an

opportunity for personal gain, or other motive to prepare these documents as he did.

      For these reasons, and based on the entire record, the Court finds that First American has

not established the third element of its Section 523(a)(2)(A) claim, that Mr. Moses made the

false representations at issue with the intent to deceive First American.

Whether First American Justifiably Relied on the Misrepresentations

      The fourth element that First American must establish "is whether the creditor justifiably

relied on the debtor's false representation."  *In re Macias*, 324 B.R. at 192 (citation omitted).  As

the Supreme Court has made clear, a creditor must "'use his senses, and cannot recover if he

blindly relies upon a misrepresentation the falsity of which would be patent to him if he had

utilized his opportunity to make a cursory examination or investigation.'"  *Field v. Mans*, 516

U.S. 59, 71 (1995) (quoting *Restatement (Second) of Torts* § 541, Comment *a* (1977)).

This Court previously decided at summary judgment that First American established this element.  In its Memorandum Decision on Plaintiff's Motion for Summary Judgment, the Court found:

> The record shows that First American is the successor in interest to the rights and obligations established by a title insurance policy issued by United General Title Insurance Company.  The record also shows that Mr. Moses provided professional services in his capacity as an attorney, including the preparation of wills and deeds used in connection with the transfers of title to [the Property].  And the record leaves no doubt that the omissions in those documents were justifiably relied upon by the parties.  As a result, First American has shown that there is no genuine dispute of material fact as to this element of its Section 523(a)(2)(A) claim.

*In re Moses*, 2013 Bankr. LEXIS 2917, at *30.

Because the Court found at summary judgment that First American established this element, this finding is law of the case, and First American has established the fourth element of its Section 523(a)(2)(A) claim, that First American justifiably relied on the misrepresentations in the documents that Mr. Moses prepared.

<u>Whether Mr. Moses's Misrepresentations Proximately Caused First American To Sustain Loss or Damage</u>

The final element that First American must establish is that Mr. Moses's misrepresentations proximately caused it to sustain loss or damage.  *In re Macias*, 324 B.R. at 193.  This Court also decided this element at summary judgment:

> The Court finds that First American has been damaged in an amount that is not less than the Judgment Debt, and that First American's losses were proximately caused by the false representations and omissions contained in the documents prepared by Mr. Moses and used in connection with the transfer of title to [12 Ivy Place].  As a result of those false representations and omissions, First American was required to pay a significant sum on the title insurance policy with respect to 12 Ivy Place, and that sum amounts to a loss that was proximately caused by Mr. Moses's false representations.

*In re Moses*, 2013 Bankr. LEXIS 2917, at *30-31.

Because the Court found at summary judgment that First American established this element, this finding is law of the case, and First American has established the fifth element of its Section 523(a)(2)(A) claim, that Mr. Moses's misrepresentations proximately caused First American's losses.

*          *          *

The Court finds that First American has established the first element of its Section 523(a)(2)(A) claim, that Mr. Moses made misrepresentations with respect to the interests in 12 Ivy Place.  The Court also finds that First American has established the fourth element of its Section 523(a)(2)(A) claim, that it justifiably relied to its detriment on the misrepresentations. And the Court finds that First American has established the fifth element of its Section 523(a)(2)(A) claim, that it suffered a loss that was proximately caused by Mr. Moses's false representations.  But the Court finds that First American has not established the second element of its Section 523(a)(2)(A) claim, that Mr. Moses knew that the representations with respect to the interests in 12 Ivy Place were false at the time he made them, or the third element of its Section 523(a)(2)(A) claim, that Mr. Moses made the representations with respect to the interests in 12 Ivy Place with intent to deceive First American.

For these reasons, and based on the entire record, the Court finds and concludes that First American has not established each required element of its Section 523(a)(2)(A) claim, and for these reasons, it is not entitled to judgment on this claim.

*Whether First American Has Established that the Judgment Debt Is Nondischargeable Under Bankruptcy Code Section 523(a)(4)*

Bankruptcy Code Section 523(a)(4) provides that a "discharge under Section 727

. . . of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). In other words, a debt arising from fraud or defalcation while acting in a fiduciary capacity may not be discharged in bankruptcy. This "'dischargeability provision has for more than a century been construed narrowly and strictly by the Supreme Court.'" *Owens v. Owens (In re Owens)*, 2005 WL 387258, at *4 (S.D.N.Y. Feb. 17, 2005) (quoting *In re Gans*, 75 B.R. 474, 488 (Bankr. S.D.N.Y. 1987)), *aff'd*, 155 F. App'x 42 (2d Cir. 2005). To succeed on a Section 523(a)(4) claim, a plaintiff must establish three elements: first, the debt must result from a fiduciary's fraud or defalcation under an express or technical trust involving the entrusting of money or other property to a fiduciary for the benefit of another; second, the debtor must have acted in a fiduciary capacity with respect to the trust; and third, the transaction in question must be a "defalcation" within the meaning of bankruptcy law. *In re Duncan*, 331 B.R. at 77. And as the Supreme Court has held, in order to prevail on a nondischargeability claim under Section 523(a)(4), the party claiming nondischargeability has the burden of persuasion, which must be met by a preponderance of the evidence. *Grogan*, 498 U.S. at 291.

<u>Whether the Debt Was Incurred in Connection with an Express or Technical Trust</u>

The first element that First American must establish is that the Judgment Debt resulted from a fiduciary's defalcation under an express or technical trust involving the entrusting of money or other property to the fiduciary for the benefit of another. *Duncan*, 331 B.R. at 77. An attorney-client relationship "has long been understood to be a fiduciary relationship within the meaning of the defalcation exception," and satisfies this element, even where there is no "technical trustee or express trust." *Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re*

-27-

*Hayes)*, 183 F.3d 162, 168 (2d Cir. 1999) (citations omitted).

The Court decided this element at summary judgment. There, the Court found:

> It is undisputed by the parties that Mr. Moses acted in a fiduciary capacity as an attorney when he prepared the wills and deeds at issue here. An attorney-client relationship is a fiduciary relationship for purposes of Section 523(a)(4). As a result, First American has established that there is no genuine dispute of material fact as to the first element of its Section 523(a)(4) claim.

*In re Moses*, 2013 Bankr. LEXIS 2917, at *36.

Because the Court found at summary judgment that First American established this element, this finding is law of the case, and First American has established the first element of its Section 523(a)(4) claim, that the Judgment Debt was incurred in connection with an express or technical trust.

### Whether Mr. Moses Acted in a Fiduciary Capacity with Respect to that Trust

The second element that First American must establish is that Mr. Moses acted in a fiduciary capacity with respect to that trust-like relationship. An attorney-client relationship "entails one of the highest fiduciary duties imposed by law" and therefore "without more, [an attorney-client relationship] constitutes a fiduciary relationship within the meaning of Section 523(a)(4)." *Hayes*, 183 F.3d at 170.

The Court also determined this issue at summary judgment. There, the Court found that "it is similarly undisputed by the parties that Mr. Moses acted in his capacity as an attorney, within the scope of his duty to his clients, when he created the wills and deeds in question." *In re Moses*, 2013 Bankr. LEXIS 2917, at *36.

Because the Court found at summary judgment that First American established this element, this finding is law of the case, and First American has established the second element of

its Section 523(a)(4) claim, that Mr. Moses acted as a fiduciary when he created the will and

deeds at issue.

<u>Whether Mr. Moses's Conduct Is a Fraud or Defalcation Within the Meaning of Bankruptcy Law</u>

The third and final element that First American must establish to prevail on a Section

523(a)(4) claim is whether the debt arose from misconduct that is a "defalcation" within the

meaning of bankruptcy law. *In re Duncan*, 331 B.R. at 77.

The Supreme Court has recently clarified the meaning of this term within the bankruptcy

context. It held that "defalcation" in this context requires scienter, "a culpable state of mind

requirement akin to that which accompanies application of the other terms in the same statutory

phrase" such as fraud, embezzlement, and larceny. *Bullock*, 133 S. Ct. at 1757. *See Wang v.

Gao (In re Gao)*, No. 15-CV-3838 (E.D.N.Y. Nov. 13, 2015) (stating that "[d]efalcation requires

'a willful neglect of duty, even if not accompanied by fraud or embezzlement.'") (quoting *LSP

Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 799, 790 (5th Cir. 1993)). For this element to be

satisfied, the Supreme Court has specified that the fiduciary must have acted with actual

knowledge, with "willful blindness," or with "bad faith, moral turpitude, or other immoral

conduct." *Bullock*, 133 S. Ct. at 1756. The Supreme Court rejected the notion that a broad

definition of "defalcation" should apply, noting that such a definition would capture "even

innocent acts of failure to fully account for money received in trust," and would not be

appropriate in this context. *Bullock*, 133 S. Ct. at 1758.

The Second Circuit has held "that defalcation under § 523(a)(4) requires a showing of

conscious misbehavior or extreme recklessness – a showing akin to the showing required for

scienter in the securities law context." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 68 (2d Cir.

-29-

2007).  The Second Circuit noted that "requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation . . . insures that the harsh sanction of nondischargeability is reserved for those who exhibit 'some portion of misconduct.'"  *Id.* (quoting *Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 512 (2d Cir. 1937)).  And the court explained that this "standard does not reach fiduciaries [who failed in their duties] only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable."  *In re Hyman*, 502 F.3d at 69.  *See Grow Up Japan, Inc. v. Yoshida (In re Yoshida)*, 435 B.R. 102, 110 (Bankr. E.D.N.Y. 2010) (noting that courts in this Circuit "require a level of fault greater than mere negligence" or "an innocent mistake.")  In other words, a debtor must have committed an intentional wrong, which, at a minimum, involves the conscious disregard of "'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty."  *Bullock*, 133 S. Ct. at 1759-60 (quoting Model Penal Code § 2.02(2)(c) (1985)).

    As this Court has found, "at a minimum, a defalcation for purposes of Section 523(a)(4) must arise from conduct that justifies the substantial penalty of denial of dischargeability."  *In re Duncan*, 331 B.R. at 87.  Defalcation "requires a showing of 'conscious misbehavior or extreme recklessness.'"  *Rahman v. Park (In re Seung Min Park)*, 2011 WL 1344495, at *4 (Bankr. E.D.N.Y. Apr. 8, 2011) (quoting *In re Hyman*, 502 F.3d at 68).

    First American alleges that Mr. Moses acted as an attorney for members of the Turner family and, in that capacity, had a fiduciary relationship with the Turners.  First American also alleges that Mr. Moses "knowingly and fraudulently performed" in his fiduciary capacity by preparing the July 2001 Deed and other documents, and by allowing them to be executed and

-30-

delivered, which perpetrated "false representations and frauds" upon it.  Am. Compl. ¶ 15.  For

these reasons, First American asserts that pursuant to Section 523(a)(4), the Judgment Debt

should be found nondischargeable.

Mr. Moses responds, in substance, that his actions in connection with the preparation of

the wills and deeds were negligent, but that they do not rise to the level of willful blindness or

bad faith necessary to a finding of nondischargeability under this provision of the Bankruptcy

Code.

Here, the evidence shows that Mr. Moses's misstatements and omissions with respect to

the will and deeds at issue arose from a mistaken interpretation of the 1958 Deed, the preparation

of the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed, and from an

erroneous application of the real property doctrines of joint tenancy and other forms of tenancy.

That is, they are the product of negligence, not "conscious misbehavior or extreme recklessness."

*In re Hyman*, 502 F.3d at 68.  As noted above, Mr. Moses's testimony was persuasive and

credible with respect to the mistakes that he acknowledged he made in preparing the Rose

Turner Will, the July 2001 Deed, and the September 2001 Deed.  The evidence does not support

a finding that Mr. Moses's mistakes were the product of more than negligent error, nor does the

evidence show that Mr. Moses acted with conscious misbehavior or extreme recklessness.

For these reasons, and based on the entire record, the Court finds that First American has

not established the third element of its Section 523(a)(4) claim, that Mr. Moses's conduct

amounts to a fraud or defalcation under bankruptcy law.

*             *             *

The Court finds that First American has established the first element of its Section

-31-

523(a)(4) claim, that Mr. Moses had an attorney-client relationship with the Turners, which is the kind of trust obligation that is protected under this provision.  The Court also finds that First American has established the second element of its Section 523(a)(4) claim, that Mr. Moses acted in a fiduciary capacity with respect to that obligation when he acted as attorney to the Turners.  But the Court finds that First American has not established the third element of its Section 523(a)(4) claim, that Mr. Moses's errors in preparing the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed were the product of a fraud or defalcation in his capacity as a fiduciary.

For these reasons, and based on the entire record, the Court finds and concludes that First American has not established each required element of its Section 523(a)(4) claim, and for these reasons, it is not entitled to judgment on this claim.

*Whether First American Has Established that the Judgment Debt Is Nondischargeable Under Bankruptcy Code Section 523(a)(6)*

Bankruptcy Code Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another."  11 U.S.C. § 523(a)(6).  Citing the legislative history of this provision, the Supreme Court has observed that "'willful' in [Section 523(a)(6)]" means "'deliberate'" or "'intentional.'"  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).  *See Navistar v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 79 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5865; H.R. Rep. No. 595, 95th Cong., 2d Sess. 365 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6320).

In this context, the Second Circuit has noted that the term "malicious" means "'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.'"  *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quoting *In re Stelluti*, 94 F.3d at 87.)  *See*

-32-

*Kawaauhau*, 523 U.S. at 61 (observing that "Black's Law Dictionary defines the word

"malicious" as "done with malice and an evil design; willful," and the word "malice" as "a

wrongful act done intentionally.")

One court, surveying "the semantic confusion" caused by Section 523(a)(6), noted:

> We imagine that all courts would agree that a willful and malicious injury,
> precluding discharge in bankruptcy of the debt created by the injury, is one that
> the injurer inflicted knowing he had no legal justification and either desiring to
> inflict the injury or knowing it was highly likely to result from his act.

*In re Jendusa-Nicolai v. Larsen (In re Larsen)*, 677 F.3d 320, 324 (7th Cir. 2012).

To succeed on a Section 523(a)(6) claim, as this Court has noted, two elements must be

established. They are "first, the creditor must establish that the debtor acted willfully in

committing the injury. . . . Second, the creditor must establish that the debtor acted maliciously

in committing the injury." *In re Moses*, 2013 Bankr. LEXIS 2917, at *39.

<u>Whether Mr. Moses Willfully Injured First American</u>

The first element that First American must establish to prevail on its Section 523(a)(6)

claim is that Mr. Moses willfully injured it – that is, that the injury was the intended result of his

conduct. Under Section 523(a)(6), an injury is willful only if it was intended. *In re Larsen*, 677

F.3d at 322 (*citing Kawaauhau*, 523 U.S. at 61-62). *See Chaffee v. Chaffee (In re Chaffee)*, 2013

WL 4716320, at *6 (Bankr. N.D.N.Y. Sept. 3, 2013) (same). In construing the meaning of

willful under Section 523(a)(6), the Supreme Court has held that because "willful" modifies the

word "injury," a finding of nondischargeability requires "a deliberate or intentional injury, not

merely a deliberate or intentional act that leads to injury." *Kawaauhau*, 523 U.S. at 61

(emphasis in original). As the Supreme Court has stated:

The [Section 523](a)(6) formulation triggers in the lawyer's mind the category

-33-

"intentional torts" as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intended "the consequences" of the act, "not simply the act itself."

*Kawaauhau.* 523 U.S. at 61-62 (quoting *Restatement (Second) of Torts* § 8A, Comment a, p. 15 (1964)).  In *Kawaauhau*, the Supreme Court rejected a broader interpretation of "willful and malicious" that encompassed "acts, done intentionally, that cause injury," as being "incompatible with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed," and that would render superfluous other portions of the Bankruptcy Code. *Kawaauhau,* 523 U.S. at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).  This means that debts arising from negligently or recklessly inflicted injuries are not exempt from discharge under Section 523(a)(6).  *Kawaauhau*, 523 U.S. at 64 (stating that "negligent or reckless acts . . . do not suffice to establish that a resulting injury is 'willful and malicious.'") (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934)).

First American alleges that Mr. Moses "maliciously and recklessly" made false representations in preparing the documents that he knew First American would rely on, and that he "willfully and maliciously" concealed material facts with respect to 12 Ivy Place.  Am. Compl. ¶ 16.  According to First American, Mr. Moses's willful and malicious actions caused it to suffer damages, and for these reasons, the Judgment Debt is not dischargeable.

Mr. Moses again responds, in substance, that he made mistakes in preparing those documents, and that his actions were the result of negligent mistake or error, but they were not willful.

As discussed above, Mr. Moses testified convincingly and credibly that his actions in preparing the documents at issue were the result of mistakes that flowed from his

misunderstanding of the interests created by the 1958 Deed.  Although Mr. Moses's conduct in preparing the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed ultimately led to a loss to First American, the evidence does not show that the injury was "the *intended* result of an intentional act," because, among other reasons, First American has not established that Mr. Moses possessed the requisite culpable state of mind for the Court to reach this conclusion.  *In re Larsen*, 677 F.3d at 322 (emphasis in original).  Nor has First American shown that Mr. Moses had a financial incentive, an opportunity for personal gain, or other reason or motive to create the erroneous documents.

For these reasons, and based on the entire record, the Court finds that First American has not established the first element of its Section 523(a)(6) claim, that Mr. Moses willfully injured First American.

Whether Mr. Moses Maliciously Injured First American

The second element that First American must establish to prevail on its Section 523(a)(6) claim is that the injury caused by Mr. Moses to First American was malicious.  The Second Circuit has interpreted "malicious" in the context of Section 523(a)(6) to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will."  *In re Stelluti*, 94 F.3d at 87 (citations omitted).  Malice may either be actual or implied by the circumstances surrounding the debtor's conduct and actions.  *In re Stelluti*, 94 F.3d at 88.  It may be found where a debtor breaches a statutory duty, in "circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance to warrant the denial of discharge."  *Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (quotation omitted).

-35-

As noted above, First American alleges that Mr. Moses's actions in preparing the documents were malicious and caused it to suffer damages.  And also as noted above, Mr. Moses responds that while his actions were the result of mistake or an erroneous understanding of the law, they were not malicious.

Here, Mr. Moses testified, and the evidence shows, that he did not act with malicious intent, an intent to injure First American, or an awareness of his mistakes when he prepared the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed.  Nor was he aware at the time that his actions would cause injury to First American.  As a consequence, First American has not shown that Mr. Moses's actions were malicious, as required by this statutory provision.  And as noted above, the record does not support the conclusion that Mr. Moses had a financial incentive, an opportunity for personal gain, or other motive or cause to prepare these documents as he did.

For these reasons, and based on the entire record, the Court finds that First American has not established the second element of its Section 523(a)(6) claim, that Mr Moses maliciously injured First American.

\*              \*              \*

The Court finds that First American has not established the first element of its Section 523(a)(6) claim, that Mr. Moses willfully injured First American.  The Court also finds that First American has not established the second element of its Section 523(a)(6) claim, that Mr. Moses maliciously injured First American.

For these reasons, and based on the entire record, the Court finds and concludes that First American had not established each required element of its Section 523(a)(6) claim, and for these

reasons, it is not entitled to judgment on this claim.

*The Question of Spoliation of Evidence*

First American seeks spoliation sanctions against Mr. Moses on two grounds.  First American argues that Mr. Moses ignored discovery orders in the New Jersey Action with respect to the production of his file on the preparation of the July 2001 Deed for the 12 Ivy Place Property, which showed a joint tenancy among Lucius Turner, Rose Turner, and Ella Turner, and that Mr. Moses intentionally and willfully failed to produce this file in that action.  According to First American, this failure "subvert[ed the Plaintiff's] ability to find and offer relevant evidence."  Pl's Post-Trial Br. 21.  First American also argues that in this Court, Mr. Moses "concocted a story of the denial of access to and the destruction of his file in the summer of 2009," and seeks to have this Court "overlook that he had pulled his file from storage in August, 2009."  Pl's Post-Trial Br. 22.  As a result, First American asks the Court to draw an adverse inference against Mr. Moses, and to award sanctions against him.

Mr. Moses responds, in substance, that he lost access to the client files that he kept at an offsite storage facility because he could not afford to pay the storage fees, and that ultimately, the contents of his storage unit were sold at an auction.  He argues that contrary to First American's interpretation, his actions with respect to his client files were neither deceitful nor misleading.

Spoliation is a serious matter.  Where it is established, it leads to serious consequences. As the Second Circuit has stated, spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d

Cir. 1999). There are three elements "that a party seeking an adverse inference instruction based on the destruction of evidence must establish." *Res. Fund. Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). These are:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001).

*Res. Fund. Corp.*, 306 F.3d at 107. The "party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim." *Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 569 (S.D.N.Y. 2014) (citing *Byrnie*, 243 F.3d at 109). And where spoliation is established, a "court may impose sanctions for spoliation, exercising its inherent power to control litigation." *West*, 167 F.3d at 779. The Court applies this standard in considering both of First American's grounds for spoliation sanctions against Mr. Moses.

<u>Whether First American Has Shown that Mr. Moses Had a Duty To Preserve Records</u>

The first element that First American must show to prevail on this claim is a duty by the party who controls the evidence to preserve records. *See Chin v. Port Auth. of New York and New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (citing *Res. Fund.*, 306 F.3d at 107). The duty to preserve evidence arises when litigation is "reasonably foreseeable." *Byrnie*, 243 F.3d at 107.

First American argues that Mr. Moses's duty to preserve the records that he maintained in connection with his representation of the Turner family (the "Turner Files") arose when First American requested the information in connection with the New Jersey Action. Mr. Moses responds that under applicable New Jersey law, an attorney is required to retain records for seven years after the record is created, and by the time First American requested the Turner Files, this

period had expired.  For these reasons, Mr. Moses states, he no longer had a duty to preserve those records at the time when they were requested.

The New Jersey Advisory Committee on Professional Ethics has opined that "absent specific instructions or express agreement, and excepting 'property of the client,' attorneys are required by applicable ethics rules and principles to retain and maintain closed files for seven years."  N.J. Comm. on Prof'l Ethics, Op. 692 (2001).

The record includes a September 4, 2009 letter from First American's counsel Mr. Siberine to Mr. Moses describing a late August telephone conversation between Mr. Siberine and Mr. Moses.  The letter states that in that telephone conversation, Mr. Moses "indicated that [he] *had pulled* the [Turner Files] from storage."  Pl's Ex. 89 (emphasis added).  The record also includes an October 13, 2009 lien sale notice addressed to Mr. Moses concerning the contents of his storage unit, stating that based on his non-payment of storage fees, his right to access his storage unit had been terminated and the contents would be sold to satisfy the contractual landlord's lien asserted by U-Haul.

Mr. Siberine testified, in substance, that he wrote to Mr. Moses to confirm their telephone conversation concerning the Turner Files, and that he understood that Mr. Moses "would pull [his] file from storage."  Pl's Ex. 88.

Mr. Moses testified, in substance, that he told Mr. Siberine that he would *attempt* to retrieve the Turner Files, and that on previous visits to the U-Haul storage facility, he was unable to access his storage unit because he could not pay the storage fees.  Mr. Moses also testified that he did not receive a formal notice terminating his access to his storage unit, and that the October 13, 2009 notice from U-Haul states that his access to the storage unit was terminated and that a

lien sale was scheduled.

First American has established that beginning in August 2009, and for an extended period of time, it made repeated inquiries and demands on Mr. Moses to produce the Turner Files and any other documentation that would support the property interests reflected in the Rose Turner Will, the July 2001 Deed, and the September 2001 Deed. It has also established that it was frustrated by Mr. Moses's failures to respond to its requests or to produce those documents, including the Turner Files. And the evidence confirms that the parties' communications about the production of these files were inconclusive.

But First American has not shown that as of the time that it sought their production, Mr. Moses had a continuing duty to preserve the Turner Files. Those files concerned events that occurred in 2000 and 2001, and more than seven years had passed by the time that First American requested them in August 2009. And in all events, Mr. Moses has now acknowledged that the Rose Turner Will and deeds that he prepared were in error.

For these reasons, and based on the entire record, the Court finds that First American has not established the first element of a claim for spoliation sanctions, that Mr. Moses had a duty to preserve records.

<u>Whether First American Has Shown that Mr. Moses Had a Culpable State of Mind when the Records Were Destroyed</u>

The second element that First American must establish to prevail on its claim for spoliation sanctions is that the records were destroyed with a "culpable state of mind." *Res. Funding Corp.*, 306 F.3d at 107. As another court has noted, a culpable state of mind "rang[es] from willful destruction in bad faith to simple negligence." *Port Auth. Police Asian Jade Soc. of New York & New Jersey Inc. v. Port Auth. of New York and New Jersey*, 601 F. Supp. 2d 566,

570 (S.D.N.Y. 2009) (citing *Res. Funding Corp.*, 306 F.3d at 108).

First American asserts that in this Circuit, the "culpable state of mind" factor is satisfied where "the evidence was destroyed 'knowingly, even if without the intent to breach a duty to preserve it, or negligently.'" *Res. Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie*, 243 F.3d at 109) (internal alterations and emphasis omitted). First American argues, in substance, that Mr. Moses had the requisite culpable state of mind because he "intentionally and with willful disregard" either misrepresented that he had pulled the Turner Files from storage when he had not done so, or invented a story of denial of access to and the destruction of his file. Def's Post-Trial Br. 21-22.

Mr. Moses responds that First American has not "demonstrated by a preponderance of the evidence that [he] acted maliciously or willfully in failing to retrieve any documents from the storage unit." Def's Post-Trial Br. 23.

As noted above, Mr. Moses received late notices and lien notices from the U-Haul storage facility where he maintained a storage unit. These documents show the history of the arrears on Mr. Moses's account, and culminate in a November 21, 2009 Final Notice stating that the contents of Mr. Moses's storage unit were sold to satisfy those arrears.

And as described above, Mr. Siberine testified credibly that, in substance, he made repeated efforts to obtain the Turner Files from Mr. Moses, and he understood that Mr. Moses would retrieve the Turner Files from storage. Mr. Moses testified credibly that, in substance, he advised Mr. Siberine that he would attempt to retrieve the Turner Files from storage, and ultimately, he could not do so because he was not able to pay the past-due storage fees. That is, as described above, Mr. Siberine and Mr. Moses testified credibly, but inconsistently, as to

-41-

whether Mr. Moses was successful in retrieving the Turner Files from storage.  And as also described above, other evidence supports the conclusion that at the time of First American's requests, Mr. Moses was unable to retrieve the Turner Files, or otherwise gain access to his storage unit, because he was not able to pay his past-due storage fees.  This is not the same as acting intentionally or with willful disregard to destroy documents or to cause them to be lost.

For these reasons, and based on the entire record, the Court finds that First American has not established the second element of its claim for spoliation sanctions, that Mr. Moses destroyed the Turner Files with a culpable state of mind.

<u>Whether First American Has Shown that the Destroyed Evidence Was Relevant</u>

The third element that First American must establish to prevail on its spoliation claim is that the destroyed records "were relevant to the party's claim or defense." *Chin*, 685 F.3d at 162.  With respect to spoliation, "relevant means that the evidence must be of the sort that a reasonable jury could find *harmful* to the spoliator's case." *Port Auth. Police Asian Jade Soc.*, 601 F. Supp. 2d at 570 (emphasis added; internal quotation and citation omitted).  "Relevance and prejudice may be assumed when the breaching party acted in bad faith, and in some cases of gross negligence." *Neverson-Young v. BlackRock, Inc.*, 2011 WL 3585961, at *2 (S.D.N.Y. Aug. 11, 2011) (citation omitted).  But where a spoliating party acted only negligently, "the moving party can satisfy the final requirement of the spoliation analysis if it can show that the lost materials were relevant." *In re Pfizer Secs. Litig.*, 288 F.R.D. 297, 315 (S.D.N.Y. 2013) (citation omitted).  Relevance may be established by "adducing sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Harkabi v. SanDisk Corp.*, 275

F.R.D. 414, 420 (S.D.N.Y. 2010) (alteration in original; citation omitted).  As this suggests, the fact at issue must be disputed in order for spoliation sanctions to apply.

Mr. Siberine testified credibly that First American sought the production of the Turner Files to establish whether there was a basis for the joint tenancy asserted in the July 2001 Deed that Mr. Moses prepared.  Mr. Moses testified credibly that his failure to produce the Turner Files resulted from his inability to pay his storage fees to the U-Haul facility where those files were stored.  He also acknowledged that there is not a basis for the joint tenancy set forth in the July 2001 Deed, and that the Rose Turner Will and the deeds that he prepared were in error.

First American has not established that evidence in the Turner Files would have been harmful to Mr. Moses's case because, among other reasons, Mr. Moses does not dispute that the documents he prepared were incorrect.  Nor has First American established, for example, that Mr. Moses could have paid the storage fees, but instead chose to use those funds for other purposes, or that Mr. Moses somehow allowed his files to be lost.  And Mr. Moses testified credibly that he had fallen on hard economic times.  He also testified credibly that his failure to denominate Rose Turner, her husband Lucius Turner, and his mother Ella Turner as tenants in common with respect to 12 Ivy Place was an error, not fraud, and that he "wrote the first deed incorrectly," which "led to a series of events, that is each successive deed prepared whether by me or by other persons, failed to identify the proper, the true fee of Ros[e] Turner."  Tr. 1/22/15, 26:14-23.

For these reasons, and based on the entire record, the Court finds that First American has not established the third element of its spoliation claim, that the destroyed records were relevant to a disputed issue in its Section 523 claims.

\*            \*            \*

The Court finds that First American has not established the first element of its spoliation sanctions claim, that Mr. Moses had a duty to preserve the Turner Files at the time they were requested.  The Court also finds that First American has not established the second element of its spoliation sanctions claim, that Mr. Moses destroyed the Turner Files "with a culpable state of mind."  And the Court finds that First American has not established the third element of its spoliation sanctions claim, that the Turner Files were "relevant" to its claim or defense, and specifically, that those files would show a basis for a joint tenancy – a fact that is not disputed by Mr. Moses.

For these reasons, and based on the entire record, the Court finds and concludes that First American has not established that it is entitled to sanctions against Mr. Moses for the spoliation of evidence.

### Conclusion

For the reasons stated above, and based on the entire record, the Court finds that First American has not established its claims under Bankruptcy Code Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6).  Nor has First American established its claim for spoliation sanctions. And for these reasons, and based on the entire record, the Court finds that the Judgment Debt awarded in the New Jersey Action is dischargeable under Bankruptcy Code Section 523.  And also for these reasons, and based on the entire record, all other relief requested in the Amended Complaint is denied.

An order and judgment in accordance with this Decision After Trial will be entered simultaneously herewith.



**Dated: Brooklyn, New York**
**March 15, 2016**

_____
**Elizabeth S. Stong**
**United States Bankruptcy Judge**